IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOHNNIE E. DUNNING,                        §
                          Petitioner,      §
                                           §
v.                                         §        Civil Action No. 4:20-CV-554-O
                                           §        (Consolidated with No. 4:20-CV-559-O)
BOBBY LUMPKIN, Director,                    §
Texas Department of Criminal Justice,      §
Correctional Institutions Division,        §
                          Respondent.      §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Johnnie E. Dunning, a state prisoner confined in the Correctional Institutions Division

of the Texas Department of Criminal Justice, against Bobby Lumpkin, director of that division,

Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded

that the petition should be dismissed as time-barred in part and denied in part.

## I. BACKGROUND

On July 14, 1999, in Tarrant County, Texas, Case No. 0632435D, Petitioner pleaded guilty

in accordance with a plea agreement to one count of aggravated sexual assault of a child younger

than 14 years of age and true to the habitual-offender allegation in the indictment and was sentenced

to 25 years' imprisonment. Clerk's R. 77, ECF No. 17-2. Petitioner's conviction was affirmed on

appeal and, on June 26, 2002, the Texas Court of Criminal Appeals refused Petitioner's petition for

discretionary review. Mem. Op. 6, ECF No. 17-46; Resp't's Answer 4. In May 2010 petitioner

initiated DNA proceedings under chapter 64 of the Texas Code of Criminal Procedure, which, after

testing, ultimately culminated in an unfavorable finding by the trial court. Clerk's R. 102-03, 143,

ECF No. 17-2. The appellate court reversed the trial court's ruling, but the Texas Court of Criminal

Appeals reversed the appellate court and affirmed the trial court's finding. COA Op. 1-2, ECF No. 17-19; CCA Op. 1-2, ECF No. 17-32. On May 22, 2019, the Texas Court of Criminal Appeals denied Petitioner's motion for rehearing. Electronic R. 1, ECF No. 17-40; Notice, ECF No. 17-58. Petitioner then sought state habeas-corpus relief by filing a state application for habeas corpus on February 11, 2020, which was denied by the Texas Court of Criminal Appeals without written order.[1] SHR[2] 23, ECF No. 17-56. This federal petition for federal habeas relief was filed on May 22, 2020.[3] Pet. II[4] 10, ECF No. 1.

The Texas Court of Criminal Appeals gave the following summary of the proceedings in this case:

### a. Trial Proceedings

In 1999, [Petitioner] was charged with aggravated sexual assault of a twelve-year-old, allegedly intellectually disabled child by inserting his penis into the victim's anus. After the jury was sworn in, and [Petitioner] pled not guilty, the trial court granted the State's motion in limine to exclude evidence of prior convictions supporting the defense's theory that Lorne Clark, a registered sex offender and the stepfather of the victim, was the actual perpetrator. Clark lived with his stepson and was one of the first people his stepson told about the assault. Clark had also been convicted of first-degree sexual abuse of his stepdaughter in Arkansas, and a few weeks before [Petitioner]'s trial was set to begin, he pled guilty to sexually assaulting two female children who lived in the same apartment complex. [Petitioner] wanted to argue that Clark, a white man, sexually assaulted his stepson and manipulated him into accusing a "black man" of raping him to deflect attention from himself.

---

[1] A prisoner's pro se state habeas application is deemed filed when placed in the prison mailing system. *Richards v. Thaler*, 710 F.3d 573, 578-79 (5th Cir. 2013). Petitioner's state application does not provide that information, however he signed the document on February 11, 2020; thus, the application is deemed filed on that date.

[2] "SHR" refers to the record of Petitioner's state habeas proceeding in WR-91,096-01.

[3] A prisoner's pro se federal habeas petition is also deemed filed when placed in the prison mailing system. *Spotville v. Cain*, 149 F.3d 374, 377 (5th Cir. 1998).

[4] The petition filed in the lead case, civil action no. 4:20-cv-554-O, is referred to in this opinion as Petition I and referenced as Pet. I; the petition filed in civil action no. 4:20-cv-559-O is referred to as Petition II and referenced as Pet. II.

[Petitioner] is black. After the court granted the State's motion in limine, [Petitioner] made an offer of proof and pled guilty pursuant to a plea bargain. He entered a written judicial confession and confessed to committing the crime on the stand. The parties also agreed to the following stipulation:

> [STATE]: Your Honor, at this time, the State and the defense have stipulated to the following facts as being true and correct: We believe the testimony and the evidence would show at trial that the victim of this offense . . . at no time, has ever made any allegation regarding Lorne Clark sexually abusing him. There has been no allegation, formally or informally to anyone at all, no police agency, not CPS, no family member. At no time [has] [the victim] ever accused Lorne Clark of sexually abusing him in any fashion.
>
> And that would conclude our stipulation.
>
> [DEFENSE]: We agree to stipulate to that, Your Honor.

[Petitioner] was sentenced to 25 years' confinement as a habitual offender but was allowed to appeal the trial court's ruling.

The State maintained custody of the sexual assault kit and the white shorts that the victim wore during and after the assault. The victim was still wearing the shorts when he went to the hospital two days after the assault. The police report showed that the victim had not bathed or washed his genitals after the assault. No serology or DNA testing was performed before [Petitioner] pled guilty.[5]

### b. Chapter 64 Proceedings

In 2010, [Petitioner] moved for post-conviction DNA testing. The Department of Public Safety (DPS) Crime Laboratory technician, Nicole Mullins, tested (1) an anal swab, (2) a perianal swab, (3) a swab from the back-waistband of the shorts, and (4) a swab from the inside front-crotch area of the shorts. She did not find any interpretable DNA profiles. The trial court entered a non-favorable finding because the results were inconclusive. [Petitioner] appealed, but during the pendency of his appeal, the trial court appointed counsel to represent him. A motion to dismiss was filed, which the court of appeals granted.

[Petitioner] then sought to conduct his own DNA testing at the Serological Research Institute (SERI). The trial court granted [Petitioner]'s motion and rescinded its non-favorable finding. Serologist Amy Lee performed the testing. She reached the

---

[5]There was forensic testing performed for semen on the shorts and the sexual assault kit, but none was present on the shorts or the anal and perianal specimens from the victim's body. SHR 19, ECF No. 17-57.

3

following conclusions,

> (1) The anal-swab extract contained a single source male DNA profile matching the victim at all tested loci.

> (2) The perianal-swab extract contained a single weak male DNA profile from which the victim is included as a possible source. The defendant is excluded as a possible contributor to that profile.

> (3) A single weak male DNA profile was obtained from the white-shorts swab that includes the victim as a possible source with the chance that another random person unrelated to him could be similarly included is approximately one in 330,000. The defendant is excluded as a possible contributor to that profile.

> (4) A mixture of at least two individuals was obtained from the front-crotch swab and extract. The victim is included as the major contributor to both mixtures and the chance that another random person unrelated to him could be similarly included is approximately one in one billion. The defendant is excluded as a possible contributor to both mixtures.

> (5) A mixture of at least two individuals was obtained from the back-waistband swab with both the victim and the defendant excluded as possible contributors to its major portion. There is insufficient information in its minor component to draw any conclusions.

> (6) The extract from the back-waistband swab contained a weak mixture of at least two individuals, including at least one male, but there is insufficient information for any further conclusions to be made.

> (7) No DNA was obtained from either of the reagent blank extracts.

The State asked Doctor Bruce Budowle to review Lee's conclusions, and he agreed with all of them except Conclusion # 5. He disagreed that the victim could be excluded as the contributor to the major portion of the mixture found on the back-waistband swab. The importance of the disagreement is that, if [Petitioner] and the victim are excluded, then that DNA from the major portion of the mixture came from a third party, but if the victim cannot be excluded, as Budowle asserted, then the major contributor could be the victim or another person. (i.e., the result is inconclusive). He also cautioned against overstating the probative value of finding trace third-party DNA on the crotch swab and in the crotch extract. The trial court then entered a new non-favorable finding after "reviewing the evidence presented before it" because the DNA results did "not cast affirmative doubt on the defendant's

guilt."

c. The Court of Appeals

On appeal, the State argued that [Petitioner]'s exclusion as a major contributor to all of the tested items was not exculpatory because it did not prove that he was not the assailant. It further asserted that, even if the results were exculpatory to some degree, [Petitioner] still could not prevail because the victim identified him in a photographic array and because [Petitioner] entered a judicial confession and confessed on the stand to committing the assault. It also argued that the trial court's finding should be upheld because, in entering a non-favorable finding, the trial court must have credited Budowle's testimony, not Lee's, that the test results from the back-waistband swab were inconclusive and that the presence of minor DNA profiles on the front-crotch area swab did not show that there was an alternative suspect.

The court of appeals found that the exclusion of [Petitioner] as a major contributor to all of the tested items, and the results showing the existence of DNA from a third person in the crotch of the shorts, were strongly exculpatory. It reasoned that this is not a case in which the defendant's DNA is simply absent or where it is inconclusive as to whether the defendant was a contributor. It also distinguished this case from *LaRue v. State,* 518 S.W.3d 439, 446 (Tex. Crim. App. 2017) because, here, the effect of the exculpatory DNA evidence does not merely "muddy the waters."

In weighing the test results against the inculpatory evidence, the court of appeals accorded [Petitioner]'s guilty plea and testimonial confession little value because it concluded that [Petitioner]'s plea was involuntary. According to the court, [Petitioner] pled guilty only because the trial court granted the State's motion in limine excluding evidence of Clark as a possible alternative suspect—the "platform" of [Petitioner]'s defense—because he was indicted as a habitual offender, and because the State agreed to recommend the minimum term of confinement of 25 years. The court also cited the fact that [Petitioner] was prepared to go to trial before the motion in limine ruling.

The court of appeals acknowledged that the victim identified [Petitioner] as his rapist in a photographic array, but it said that it also had to consider that "[the victim] was twelve years old, was mentally impaired and hearing impaired, lived with Clark, and according to [Petitioner]'s trial counsel, could have been easily manipulated by Clark to deflect suspicion away from himself. Clark had also spoken to police and reported that his stepson had said that 'a black man raped me.'"

The court went on to explain that,

> [E]xamining the entire record, giving almost total deference to the
> trial court's resolution of disputed historical fact issues supported by

5

the record and applications-of-law-to-fact issues turning on witness credibility and demeanor, the record before us reflects:

• that [Petitioner] had pleaded not guilty;

• that [Petitioner] was prepared to begin trial before a jury;

• that [Petitioner] signed a judicial confession the morning of trial only after the trial court ruled he could not present Clark's Arkansas conviction to the jury or mention or present arguments concerning Clark;

• that [Petitioner] faced up to a life sentence and that, in exchange for his guilty plea and judicial confession, the State agreed to the minimum 25-year sentence;

• that within three weeks of his guilty plea [Petitioner] filed a pro se motion for new trial explaining that his decision to plead guilty was an error and was made based on the exclusion on the morning of trial of any evidence or arguments concerning Clark—the "platform" of his case—which had left him "frantically scrambling";

• that identity was an issue—in fact, the only issue;

• that the DNA test results established the absence of [Petitioner]'s DNA on all tested items—including the crotch of complainant's shorts worn during the sexual assault and not removed until the complainant reached the hospital;

• that the DNA test results established that not only was [Petitioner]'s DNA not present in the "shorts crotch swab," but that another person's DNA was present there along with the complainant's DNA; and

• that [Petitioner]'s and the State's experts both agreed that another person—who was not [Petitioner] and not the complainant—had contributed DNA to the "shorts crotch swab" tested and to the "shorts crotch extract" tested.

In light of all these facts—including [Petitioner]'s judicial confession and the complainant's identification of [Petitioner] from a photographic lineup—applying a de novo standard of review to the

> application-of-the-law-to-the-fact-issue of whether [Petitioner] has proved that had the post-conviction DNA test results we now have been available during the trial of the offense it is reasonably probable that he would not have been convicted, we hold that he has so proven by a preponderance of the evidence . . . .

The State asked Doctor Bruce Budowle to review Lee's conclusions, and he agreed with all of them except Conclusion # 5. He disagreed that the victim could be excluded as the contributor to the major portion of the mixture found on the back-waistband swab. The importance of the disagreement is that, if [Petitioner] and the victim are excluded, then that DNA from the major portion of the mixture came from a third party, but if the victim cannot be excluded, as Budowle asserted, then the major contributor could be the victim or another person. (i.e., the result is inconclusive). He also cautioned against overstating the probative value of finding trace third-party DNA on the crotch swab and in the crotch extract. The trial court then entered a new non-favorable finding after "reviewing the evidence presented before it" because the DNA results did "not cast affirmative doubt on the defendant's guilt."

*Dunning v. State,* 572 S.W.3d 685, 688-92 (Tex. Crim. App. 2019) (footnotes and citations omitted).

Having set out this summary, the court engaged in the following analysis in reversing the appellate court:

## ANALYSIS

The State asked us to review the decision of the court of appeals, and after doing so, we conclude that it erred when it decided that the trial court should have entered a favorable finding. It reached the wrong conclusion because it accorded too much weight to the test results excluding [Petitioner] as a major contributor to the tested items and showing the presence of third-party trace DNA in the crotch area of the shorts and because it gave too little weight to the inculpatory evidence.

### a. Standard of Review and Implicit Findings

The trial court entered a non-favorable finding. When reviewing an Article 64.04 favorability finding, we apply a bifurcated standard of review, affording almost total deference to a trial court's resolution of historical facts and mixed questions that turn on credibility and demeanor, but we review de novo mixed questions that do not turn on credibility and demeanor and questions of law. When the trial court does not enter separate findings, we imply findings necessary to support the ruling so long as they are reasonably supported by the record.

7

b. Test Results

At the Chapter 64 hearing, Budowle agreed with Lee that there was third-party DNA on the crotch swab and in the crotch-swab extract. The two primary issues litigated at the hearing were whether third-party DNA was present on the back-waistband swab and the probative value of third-party trace DNA on the tested items.

1. Back-Waistband Swab

Budowle disagreed with Lee's conclusion that the victim could be excluded as a possible contributor to the mixture on the back-waistband swab because she did not consider all of the testing data. Under SERI's protocols, if an allelic peak fell below a certain threshold—called the stochastic threshold—the technician had to ignore the data even if the peak was barely below it. Budowle acknowledged that the threshold serves an important purpose, but he thought that SERI's protocols should call for a more holistic review. When examining all of the allelic peaks from the back-waistband swab, including peaks that were just below the stochastic threshold, Budowle concluded that the major DNA profile from the swab is consistent with the victim's profile. Lee agreed with Budowle that, using his analysis, the victim could not be excluded, but she explained that she was constrained to follow SERI protocols.

2. Third Party Trace DNA on the Crotch Swab and in the Extract

With respect to the third-party DNA found in the crotch area, Budowle cautioned against jumping to the conclusion that the third-party DNA was from the "real" perpetrator. He said that the DNA samples from this case were all low-level trace DNA, also referred to as touch-transfer DNA or "touch" DNA, and he explained that there are many innocent ways by which low-level trace DNA can be transferred to an item of clothing. For example, he testified that it can be transferred between clothes that are washed together. Because of that, Budowle thought that the probative value of the sample was low because it merely showed that someone else had touched the shorts at some point, and that, even then, the DNA was not necessarily from the person who touched the shorts. We have expressed similar concerns: "[T]ouch DNA poses special problems because 'epithelial cells are ubiquitous on handled materials,' because 'there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them,' and because 'touch DNA analysis cannot determine when an epithelial cell was deposited.'" Consequently, we said, "the significant possibility of [touch] DNA being deposited by an innocent person reduces the probative value of any [touch] DNA test result."

3. Discussion

8

While [Petitioner] is excluded as a major contributor to the tested items, that in and of itself, is insufficient to meet his burden under Article 64.04.9 The court of appeals, however, emphasized that the test results were strongly exonerating, not only because Appellant was excluded as a contributor to all the tested items, but also because the technicians agreed that third-party DNA was on the crotch swab and in the crotch-swab extract. The court of appeals accorded too much value to the presence of the third-party DNA found in the crotch area, but to reach that conclusion, it had to disbelieve Budowle's testimony about the low probative value of the touch DNA. This might be a proper view of the evidence had the trial court entered a favorable finding, but it did not. It entered a non-favorable finding.

[Petitioner] complains that Budowle improperly suggested that the shorts were contaminated with trace DNA after the police seized them (i.e., that the chain of custody had been compromised), but that was not Budowle's testimony. He testified that, generally, touch DNA is typically low-level, and as a result, is difficult to analyze, and that it is easily transferred to clothes. According to Budowle, he finds mixtures of touch DNA from innocent people on clothing "all the time."

We agree with the State that the court of appeals erred because it failed to defer to the trial court's implicit determination that Budowle's testimony was credible. When that determination is accorded its proper deference, the results revealing third-party touch DNA from the crotch area of the shorts were significantly less probative than the court of appeals concluded.

### c. Inculpatory Evidence

### 1. Guilty Pleas and "During Trial"

During the trial of [Petitioner]'s offense, he pled guilty. He also entered a judicial confession and expressly admitted on the stand that he inserted his penis into the victim's anus. Under Article 64.04, the question is whether the inculpatory evidence—including [Petitioner]'s guilty plea, judicial confession, his testimonial confession, and other inculpatory evidence adduced at the Chapter 64 hearing—is so undermined by the test results that it is reasonably probable that a fact finder would not have convicted [Petitioner] had the tests been available at trial despite the inculpatory evidence.

A guilty plea is typically strong evidence supporting a non-favorable finding because "[c]onvicting courts should . . . give great respect to knowing, voluntary, and intelligent pleas of guilty." While a guilty plea does not preclude a favorable finding under Article 64.04,16 as the court of appeals correctly pointed out, if there is no reason to believe that a defendant's plea was inaccurate or unreliable, that plea

should be given great weight. If the test results are exceedingly exculpatory, however, "it is difficult to conclude that a prior guilty plea was accurate or reliable." In such a case, the defendant's guilty plea might be outweighed.

Here, the court of appeals gave little weight to [Petitioner]'s guilty plea, judicial confession, and testimonial confession because it concluded that his guilty plea was involuntary. But [Petitioner] asserts that he has never argued that his guilty plea was involuntary, only that he pled guilty because of the trial court's ruling on the morning before the trial. That shows only that [Petitioner] was prepared to go to trial so long as he was allowed to present the defense of his choice, not that his guilty plea, judicial confession, and testimony are inaccurate or unreliable. The plea-hearing transcript also shows that [Petitioner] knew the character of the State's evidence when he pled guilty. He knew that there was no DNA or serology testing and that the State's case was based on the identifications by the allegedly intellectually disabled and hearing-impaired victim who was under fourteen years of age. Yet, he nonetheless chose to plead guilty.

The post-conviction DNA test results are no more helpful in showing that [Petitioner]'s plea was inaccurate or unreliable. Even though [Petitioner] was excluded as a major contributor to all the items tested, and testing revealed the presence of third-party touch DNA in the crotch area of the victim's shorts, the results are not the sort that would call into question the accuracy or reliability of his guilty plea because they only "muddy the waters." In short, the court of appeals erred when it gave little weight to [Petitioner]'s guilty plea, judicial confession, and testimonial confession because [Petitioner] has not shown that his guilty plea was inaccurate or unreliable.

### 2. Inculpatory Evidence from the Chapter 64 Hearing

The vast majority of the evidence adduced at the Chapter 64 hearing was inculpatory. Specifically, the State introduced into evidence a copy of its investigative file, and it argues that the court of appeals erred because it did not consider the inculpatory information even though it was admitted at the Article 64.04 hearing. From our review of the lower court's opinion, it is not clear whether it relied on the investigative file, but to the extent that it might not have considered it or other inculpatory evidence before the trial court at the Article 64.04 hearing, it erred.

The investigative file shows that the victim spoke with James Oliver by the apartment-complex pool after he was raped and that the victim pointed to a black man and said that he was a "raper." When interviewed by police, Oliver described the man's appearance, including that the man had a "goatee type beard and mustache . . . ." and that he was wearing beige slacks, a blue and white striped shirt, and a baseball hat. The victim's mother and stepfather told the police that Oliver might be

talking about a man named Allen Beavers, who frequented Apartment # 145. The victim also told police that his assailant was a "big black man with a beard and a mustache."

The next day, the victim told his mother that his assailant was sitting on the stairs in front of Apartment # 145. When the two walked over there, the victim pointed to [Petitioner]. The apartment-complex manager contacted police, and when they arrived, several people also identified [Petitioner]. According to witnesses, [Petitioner] was a daily visitor to Apartment # 145, and when the officer spoke to him, [Petitioner] "seemed to know quite a bit of info[rmation] about the offense." The victim's mother and sister also gave statements to the police implicating [Petitioner]. His sister wrote that she was coming home from a friend's house the night of the offense when she saw "Joe," and he was wearing a white and striped shirt with black slacks. She described him as a black man with slicked back hair with curls in the back, and she said that he carries a baseball cap. She also said that, "when my brother describe[d] him to me I knew it was the guy who assaulted my brother because he was wearing the same thing my brother told me he was wearing and what he looked like." The mother wrote that her son told her that "a black man had sex with him in the [laundromat] . . . ." when she came home from work. She also said that Jim (Oliver) was at the pool when her son approached him and pointed at his assailant and said "he is a rapist." The man was wearing a white shirt with stripes, black pants, and headphones. She realized the next day that the man Oliver described regularly went to the Stop-N-Go, where she worked, and he carried a blue backpack and headphones. She also realized that he came into her store the night of the offense and was wearing a white shirt with stripes and black pants and was carrying a baseball cap.

Doctor Leah Lamb of the Cook Children's Hospital examined the victim. Her findings supported that he had been sexually assaulted. Glenda Wood from the Tarrant County District Attorney's Office interviewed the victim, and he told her the same story that he had originally told police. At the police station, the victim picked out [Petitioner] as his assailant in a photographic array. When he did so, he said "that's the man that had sex with me." The officer separately showed the photographic array to the victim's mother and sister; both identified [Petitioner] as the person that the victim described to them and as someone who loiters at the apartment complex at Apartment # 145.

According to the court of appeals, the victim's identification of [Petitioner] was not conclusive of the favorability issue because we have stated that "any overwhelming eye-witness identification and strong circumstantial evidence . . . supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under Article 64.03(a)(2)(A)." That is true, but in *Esparza* [*v. State,* 282 S.W.3d 913, 922 (Tex.

Crim. App. 2009),] we were dealing with Article 64.03(a)(2)(A)—entitlement to DNA testing—not Article 64.04—whether DNA test results are favorable. When a defendant files a Chapter 64 motion to obtain DNA testing, he must include an affidavit in which he alleges facts showing that the test results will be so exonerating that he would not have been convicted at trial had the results been available. Under Article 64.04, the judge does not consider the defendant's claims about how exculpatory he thinks the results will be if the testing is performed, as in *Esparza*; he must consider the results after testing is performed to determine the exculpatory value, if any, of the test results and whether the results meet the standard set out in Article 64.04. In relying on *Esparza* in its Article 64.04 analysis, the court of appeals erred.

It also erred when it dismissed the victim's multiple identifications of [Petitioner] as his rapist because "according to [Petitioner]'s trial counsel, [the victim] could have been easily manipulated by Clark to deflect suspicion away from himself," and "Clark had spoken to police and reported that the complainant had said that 'a black man raped me.'" There was no evidence that the victim had been coached to falsely accuse [Petitioner] or that he could be easily manipulated. That was just trial counsel's theory of the case. Moreover, in reaching its conclusion, the court of appeals's wrongly credited the testimony of [Petitioner]'s trial counsel even though the trial court entered a non-favorable ruling. In entering a non-favorable finding, the trial court must not have believed trial counsel's claim that the victim could be easily manipulated into falsely accusing an innocent person of sexual assault.

## CONCLUSION

In summary, the court of appeals did not defer to implicit credibility and demeanor determinations made by the trial court that weighed against [Petitioner]. After properly deferring to those determinations, the test results are significantly less exculpatory than the lower court found. Moreover, the court of appeals gave too little weight to [Petitioner]'s guilty plea and testimonial confession.

*Id.* at 690-98 (footnotes and citations omitted).

## II. GROUNDS FOR RELIEF

In Petition I, Petitioner raises the following grounds for relief and supporting facts, verbatim

(all spelling, punctuation, and/or grammatical errors are in the original):

(1)     Denial of DNA relevance hearing on 2–27–2017 and 7–6–2017:

On the above dates I was denied and the habeas petition, which the

12

Court of Criminal Appeals denied without written order. Counsel failed to request DNA hearing/testing. Counsel failure about victim.

(2)   DNA case requested in 2010:

The first hearing on DNA 6–9 –2015 this was denied. I didn't have counsel.

(3)   DNA testing:

Told SERI labs was not qualified.

(4)   Post-conviction application:

Denied by Court of Criminal Appeals. Counsel did not advise me that the victims mother had lied regarding knowing the separate sexual accusations against Lorne Clark.

Pet. I 6-7, ECF No. 1.

In Petition II, Petitioner raises the following grounds for relief and supporting facts, verbatim

(all spelling, punctuation, and/or grammatical errors are in the original):

(5)   Ineffective assistance of counsel:

Due to limited legal knowledge, it took me over twenty years with new counsel assist to show the status of due diligence and the state's argument of prejudice to my non-feigned ignorance of the law.

(6)   Due process during chapter 64 DNA proceedings:

It took the court four years to bring this to fruition. At my first hearing I was denied counsel. At the second DNA the DPS found an non-conclusive (inconclusive) data that deemed me unfavorable.

(7)   Ineffective counsel/Ineffective Assistance Counseling:

I pled guilty because I didn't know the facts, some of which my attorney either didn't tell me or the DA didn't tell him. Limited knowledge.

(8)   Denial of due process during chapter 64 DNA proceedings:

13

I asked for a DNA test which was lost for four years and when found I was denied benefit of counsel. I appeared, was given counsel and the DNA results showed that there was DNA in the relevant area that was neither mine or complaints.

(9)     Involuntary plea:

I was not told the consequences of such actions. My attorney nor the DNA stress this.

(10)    *Brady*:

The state at every interval refused to let me present key evidence DNA from labs in California and Pennsylvania.

(11)    Would not have entered plea of guilt if made aware of newly discovered evidence:

Bereft of counsel and not cognizant of law and unaware of SERI lab results which was not afforded to me I never would have been "coerced" or led to enter guilty plea.

(12)    Innocent due to pertinent denial of information and new evidence (*Brady*):

The facts speak for themselves. Also at every interval I have been denied due process and hampered from my quest to show relevance.

Pet. II 11–14, ECF No. 1. Respondent asserts that the action should be dismissed with prejudice as time barred, incognizable, or meritless. Resp't's Answer 1, ECF No. 15.

## III. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act. 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or

that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute further requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Additionally, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

### B. Statute of Limitations

As a preliminary matter, Respondent asserts that to the extent Petitioner challenges his 1999 guilty plea and resultant conviction, the petition is time barred under the federal statute of limitations. Resp't's Answer 9-22, ECF No. 15. The Court agrees. Title 28, United States Code, § 2244(d) imposes a one-year statute of limitations on federal petitions for writ of habeas corpus filed by state prisoners. Section 2244(d) provides:

(1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitations period shall run from the latest of–

(A)  the date on which the judgment became final by the conclusion

of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

Although it is unclear, grounds (4), (5), (7), (9), (11), and (12) appear to challenge the 1999 plea proceedings and conviction. Under subsection (A), applicable to such claims, the limitations period began to run on the date on which the judgment of conviction became final by the conclusion of direct review or, as in this case, the expiration of the time for seeking direct review. For purposes of this provision, the trial court's judgment of conviction became final upon expiration of the time that Petitioner had for filing a petition for writ of certiorari in the United States Supreme Court on September 24, 2002. SUP. CT. R. 13.1. Thus, Petitioner's federal petition as to the claims was due one year later on September 24, 2003, absent any tolling.

Tolling of the limitations period may be appropriate under the statutory provision in § 2244(d)(2) and/or as a matter of equity. Petitioner's 2010 motion for DNA testing and subsequent state habeas-corpus application, filed long after limitations had already expired, did not operate to

16

toll the federal limitations period under the statutory provision. *Scott v. Johnson,* 227 F.3d 260, 263 (5th Cir. 2000).

Nor has Petitioner demonstrated that he is entitled to tolling as a matter of equity. Equitable tolling is permitted only in rare and exceptional circumstances when, although pursuing his rights diligently, an extraordinary factor beyond the petitioner's control prevents him from filing in a timely manner or he can prove that he is actually innocent of the crime for which he was convicted. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *Holland v. Florida*, 560 U.S. 631, 649 (2010). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin,* 569 U.S. at 386 (quoting *Schlup v. Delo,* 513 U.S. 298, 329 (1995)).

Petitioner asserts that his decision to enter his guilty plea was not informed because he did not have the DNA test results now in his possession and, although he was aware that Lorne Clark was an "abuser of minors," he was not aware of the fact that at the time of his arrest, there was an outstanding investigation of Lorne Clark concerning his sexual abuse of two of Clark's daughter's friends by the same police detective and prosecuted by the same prosecutors; that Lorne Clark and his wife, Janetta Clark, were involved in the identification of Petitioner as a suspect; and that Janetta Clark admitted to lying to the police about Lorne Clark's previous out of state sexual convictions, all or some of which would have been *Brady* material in Petitioner's case. Pet'r's Reply 3, ECF No. 18. According to Petitioner, this information was in Lorne Clark's case file but was not in his case file and thus was undiscoverable with due diligence. *Id.* at 3-4.

First, even assuming the information regarding the Clarks is *Brady* material, Petitioner

17

waived any *Brady* violation by his guilty plea. *See U.S. v. Santa Cruz,* 297 Fed. App'x 300, 301 (5th Cir. 2008) (providing petitioner's argument that "his guilty plea was not knowing and voluntary because of the Government's alleged *Brady* violations, which occurred before his guilty plea was entered" was foreclosed by circuit precedent). *See also Matthew v. Johnson,* 201 F.3d 353, 362 (5th Cir. 2000) (providing "the failure of a prosecutor to disclose exculpatory information to an individual waiving his right to trial is not a constitutional violation"); *United States v. Ruiz,* 536 U.S. 622, 629 (2002) (providing the Constitution does not require the pre-guilty plea disclosure of impeachment information). The record reflects that Petitioner executed the written plea admonishments acknowledging that he understood his rights and waivers; that he was aware of the consequences of his plea; that his plea was freely and voluntarily entered; that he was "totally satisfied with [counsel's] representation"; and that counsel provided "fully effective and competent representation." SHR 37, ECF No. 17-57; Clerk's R. 75, ECF No. 17-2. Petitioner also pleaded guilty in open court and judicially confessed to committing the offense. *Id.* His representations during the plea proceedings "carry a strong presumption of verity," and the official records, signed by Petitioner, his counsel, and the state trial judge are entitled to a presumption of regularity and are accorded great evidentiary value. *Blackledge v. Allison,* 431 U.S. 63, 74 (1977); *Webster v. Estelle,* 505 F.2d 926, 929-30 (5th Cir. 1974). Petitioner presents no evidence sufficient to rebut the presumption of regularity of the state court records, that his plea was voluntary, and that counsel provided effective representation. *See Strickland v. Washington,* 466 U.S. 668, 689 (1984) (providing counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"); *Webster v. Estelle,* 505 F.2d 926, 929–30 (5th Cir. 1974) (providing state court records "are entitled to a presumption of regularity");

*Mitschke v. State,* 129 S.W.3d 130, 136 (Tex. Crim. App. 2004) (providing "defendant who pleads guilty after having been properly admonished of his constitutional rights, who has knowingly and voluntarily waived those rights, and who has been admonished as required by our constitutions and art. 26.13 [of the Texas Code of Criminal Procedure] is presumed to have entered a voluntary and knowing plea").

Similarly, although actual innocence, if proved, can overcome the statute of limitations, Petitioner waived any actual-innocence claim by his guilty plea. *See United States v. Vanchaik-Molinar,* 195 Fed. App'x 262, 2006 WL 2474048, at *1 (5th Cir. 2006) ("A voluntary guilty plea waives all non-jurisdictional defects that occurred prior to the plea and precludes consideration of a claim challenging the sufficiency of the evidence."); *Roots v. Davis,* No. 4:17-CV-432-O, 2018 WL 6171625, at *2 (N.D. Tex. Nov. 26, 2018) (providing voluntary and knowing guilty plea waives actual-innocence claim); *Coleman v. Davis,* No. 4:16-CV-314-Y, 20178 WL 106837, at *3 (N.D. Tex. Jan. 11, 2017) (same). In any event, Petitioner fails to make a colorable showing that he is actually innocent in light of the DNA evidence. The Texas Court of Criminal Appeals previously determined that there was no reasonable probability that Petitioner would not have been convicted had the DNA test results been available at trial and denied Petitioner's actual-innocence claim on state habeas review without written order, which represents an adjudication on the merits of the claim. *Dunning v. State,* 572 S.W.3d 685, 698 (Tex. Crim. App. 2019). Clearly, the state court did not find the DNA evidence particularly persuasive or reliable. This Court must presume those explicit and implied determinations to be correct and apply the appropriate deference. Having done so, this Court cannot say that it is more likely than not that no reasonable juror would have voted to find Petitioner guilty of the offense in light of the DNA results.

Petitioner demonstrated little, if any, diligence in the years between his conviction and his initiation of the 2010 DNA proceedings and has not otherwise shown that he was prevented from asserting his rights in federal court by some extraordinary factor(s). His pro se status and ignorance of the law do not warrant equitable tolling. *See Felder v. Johnson,* 204 F.3d 168, 171-72 (5th Cir. 2000). His lengthy delay further mitigates against equitable tolling. "Equity is not intended for those who sleep on their rights." *Fisher v. Johnson,* 174 F.3d 710, 715 (5th Cir. 1999).

In summary, Petitioner has not established a basis for statutory or equitable tolling. Accordingly, with respect to grounds (4), (5), (7), (9), (11), and (12), Petitioner's petition was due on or before September 24, 2003. His petition filed on May 22, 2020, nearly seventeen years later is therefore time barred.

### C. Due Process

In grounds (1), (2), (3), (6), (8), and (10), Petitioner appears to challenge the DNA proceedings on the basis that (1) and (10) he was denied the opportunity to introduce his DNA test results during the live hearings; (2) he was without counsel and forced to wait five years for his first hearing; (3) he was not informed that SERI labs was not qualified; and (6) and (8) he was denied due process during the proceedings.

Respondent asserts that Petitioner's claims concerning the state court's administration of the DNA proceedings are not cognizable on federal habeas review and do not provide a basis for relief. Resp't's Answer 22, ECF No. 15. This and other district courts in Texas have held that errors in state post-conviction collateral proceedings, including DNA proceedings under chapter 64 of the Texas Code of Criminal Procedure, do not provide a basis for federal habeas relief because state post-conviction review is, by its basic nature, collateral to the proceedings resulting in a prisoner's

custody. *See, e.g., Wright v. Quarterman,* No. 4:06-cv-563-A, 2007 WL 328575, at * 2 (N.D. Tex. Jan. 3, 2007); *Cash v. Director, TDCJ-CID,* No. 5:07cv6, 2008 WL 4104490, at *1 (E.D. Tex. Aug. 29, 2008); *Hutson v. Quarterman,* No. H-06-3847, 2006 WL 6602452, at *1 (S.D. Tex. Dec. 20, 2006).  "In conducting habeas review, a federal habeas court is limited to deciding whether a conviction violated the Constitution , laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67068 (1991). *See also Skinner v. Switzer,* 526 U.S. 521, 533-34 (2011) (noting that habeas corpus is not an available remedy where relief sought is not earlier release from custody and concluding that a convicted state prisoner may press a procedural due process claim concerning access to DNA testing under 42 U.S.C. § 1983); *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999) (providing that habeas relief is not available to correct infirmities in state post-conviction proceedings). Therefore, with respect to grounds (1), (2), (3), (6), (8), and (10) challenging the DNA proceedings, Petitioner fails to state a claim for habeas relief.

## IV.  CONCLUSION

For the reasons discussed, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DISMISSED** as time-barred in part and **DENIED** in part. Also for the reasons discussed, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 28th day of January, 2021.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

21